UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PAUL MERRELL,<br><br>Plaintiff,<br><br>v.<br><br>RALPH LAUREN CORPORATION,<br><br>Defendant. | Case No. 23-cv-06669-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION AND GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE**<br><br>Re: Dkt. Nos. 77, 82, 84, 109, 136, 142, 146 |

Pending before the Court are (1) Defendant's motion to exclude the expert opinions of Dr. Jon A. Krosnick, Dkt. Nos. 82 (redacted), 142 (unredacted); (2) Defendant's motion to exclude the expert opinions of Dr. William C. Easttom, II, Dkt. Nos. 84 (redacted), 146 (unredacted); (3) Plaintiff's motion to strike and exclude the expert report and declarations of Aaron Cannon, Dkt. No. 109; and (4) Plaintiff's motion for class certification, Dkt. Nos. 77 (redacted), 136 (unredacted). The Court took the motions to exclude under submission without oral argument, *see* Civil L.R. 7-1(b), and held a hearing on Plaintiff's motion for class certification, Dkt. Nos. 125 (minute entry), 135 ("Tr."). The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motions and **GRANTS IN PART** and **DENIES IN PART** Defendant's motions.

## I.    BACKGROUND

In May 2025, Plaintiff Richard Paul Merrell filed the operative putative class action complaint against Defendant Ralph Lauren Corporation. *See* Dkt. No. 58 ("FAC"). Plaintiff is visually impaired and legally blind, and he uses screen-reading software to read website content using his computer. *Id.* ¶ 1. Screen-reading software (or a "screen reader") allows blind and visually impaired users to access websites using a combination of a keyboard and "software that vocalizes the visual information found on a computer screen." *Id.* ¶ 17. "For screen-reading

software to function, the information on a website must be capable of being rendered into text." *Id.* ¶ 21.

Plaintiff alleges that Defendant's website, including but not limited to https://www.ralphlauren.com/, "is not fully or equally accessible to blind and visually impaired consumers." *Id.* ¶ 3. Plaintiff alleges that Defendant's website "offers features which should allow all consumers to access the goods and services which Defendant offers in connection with its physical locations," including "apparel, bags, shoes, watches, gift cards, returns, exchanges, instore appointments and Defendant's store locations." *Id.* ¶ 25. According to Plaintiff, "Defendant's failure to properly code its website" to be accessible means that he and other class members "have been and are still being denied equal and full access to Defendant's retail stores and the numerous goods, services, and benefits offered to the public through Defendant's website in conjunction with Defendant's brick-and-mortar retail store locations." *Id.* ¶ 26.

For example, Plaintiff claims that he "encountered issues with links to the directions for the Ralph Lauren stores" when using a screen reader to browse Defendant's website to make an online purchase for instore pickup. *Id.* ¶ 28. Plaintiff similarly alleges that Defendant's "Book an Appointment" feature "contains links and buttons that are not coded to be announced by screen readers," which "results in screen readers announcing the links and buttons with generic names such as 'link,' 'button,' or 'clickable.'" *Id.* ¶ 29. "If Defendant's website was accessible, Plaintiff and Class Members [allegedly] could independently access information about goods and services offered and consummate a purchase as a sighted person can." *Id.* ¶ 44.

Plaintiff alleges violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.* *Id.* ¶¶ 60–71. Plaintiff brings this class action on behalf of a nationwide class of "all legally blind individuals who have attempted to access Defendant's website using screen-reading software from January 2022 up to and including final judgment in this action," and a California class of "all legally blind individuals in the State of California who have attempted to access Defendant's website using screen-reading software during January 2022 to July 31, 2023." *Id.* ¶ 48. However, Plaintiff also proposes a revised class definition for the California subclass in his motion for class certification

2

of "[a]ll California residents who are legally blind, and who, between January 1, 2022 and July 31, 2023, visited ralphlauren.com with a screen reader and interacted with store-linked website functionality that provides store-specific information or initiates, modifies, or completes in-person transactions or services at Ralph Lauren physical stores." Dkt. No. 136 at 13 n.3.

## II.   MOTIONS TO EXCLUDE

Pending before the Court are Defendant's motions to exclude the expert opinions of Dr. Jon A. Krosnick and Dr. William C. Easttom, II, Dkt. Nos. 82, 84, 142, 146, and Plaintiff's motion to strike and exclude the expert report and declarations of Aaron Cannon, Dkt. No. 109.

### A.  Legal Standard

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." (quotation omitted)). Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565 (quotation omitted). To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564. "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d

3

645, 655 (9th Cir. 2006) (quotation omitted).

The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Comm. Notes.

The Ninth Circuit has held that "in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.*; *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024–25 (9th Cir. 2024) (noting that "there is no requirement that the evidence relied upon by [p]laintiffs to support class certification be presented in an admissible form at the class certification stage"). Admissibility is also not sufficient: even if the evidence is admissible, the district court must then evaluate its persuasiveness during the class certification analysis. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The Ninth Circuit has also stated that it "license[s] greater evidentiary freedom at the class certification stage" and that courts should not "rely[ ] on formalistic evidentiary objections" to "exclude[ ] proof that tend[s] to support class certification." *Sali*, 909 F.3d at 1006.

### B. Dr. Jon A. Krosnick

Defendant moves to exclude the March 28, 2025 expert report of Dr. Jon A. Krosnick.

United States District Court
Northern District of California

Dkt. No. 142 ("Mot.").[1]  The motion is fully briefed: Plaintiff filed an opposition, Dkt. No. 137 ("Opp."), and Defendant filed a reply, Dkt. No. 145 ("Reply").

Dr. Krosnick is a Stanford professor and a research psychologist at the U.S. Census Bureau with a degree in psychology from Harvard University and an M.A. and Ph.D. in social psychology from the University of Michigan.  Dkt. No. 136-14 ("Krosnick Rpt.") ¶¶ 1, 4.  He has taught classes and trainings on research methods, received awards for research and psychology, authored or co-authored hundreds of articles and presentations, and otherwise conducted extensive research on survey research methods.  *Id.* ¶¶ 5–10.  Based on his review of the complaint, literature and documentation about methodologies employed in past surveys of blind people, past surveys of visually impaired people, studies of accessibility challenges faced by blind people when using computers, and other information, Dr. Krosnick conducted a survey and concluded that "the number of legally blind people living in California who used a screen reader and were prevented from doing business with a physical store due to problems related to accessibility with the Ralph Lauren webpage is 3,243." *Id.* ¶¶12–13.  He also concluded that "[t]he probability that this number is greater than 40 is 100%." *Id.* ¶ 13.

Defendant argues that Dr. Krosnick's testimony should be excluded in full because (1) his opinions are unreliable and not based on sufficient facts or data; (2) his survey results are inadmissible hearsay; and (3) his survey is irrelevant and will not help the trier of fact.  Mot. at 2.

First, Defendant argues that Dr. Krosnick's survey did not use a random probability sample and instead "recruited non-representative survey respondents from Facebook groups for visually impaired people." *Id.* at 15.  But Dr. Krosnick made clear that he combined a primarily randomized probability sample with some respondents from Facebook groups oriented toward visually impaired people, and that this kind of "blended" probability sample "is a widely accepted practice in contemporary survey science."  Krosnick Rpt. ¶¶ 56–59.  In addition, Dr. Krosnick reweighted the responses from the nonprobability sample to align with demographic distributions of the legally blind adult population based on the weighted distributions from the probability

[1] The Court cites to the most recent unredacted versions of the filings throughout this order.

sample. *Id.* at 257–62.[2] Defendant may argue that a fully randomized sample would produce more representative survey results, but this goes to weight, not admissibility, and nothing suggests that a blended survey of this kind is so unreliable as to warrant exclusion. *Cf. Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("In most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

Defendant also contends that Dr. Krosnick's survey had a low response rate, leading questions, self-interest bias, recall bias, and a lack of verification of unreliable answers. Mot. at 16–21. These kinds of particularized criticisms of response rate, recall bias, and verification of answers go to weight, not admissibility. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997); *Senne v. Kansas City Royals Baseball Corp.*, 591 F. Supp. 3d 453, 482 (N.D. Cal. 2022) (concluding that questions about non-response bias, recall bias, and self-interest bias went to weight, not admissibility). The Court also is not persuaded that the survey involved leading questions or self-interest bias just because it asked participants if they wanted to "help improve the experiences of blind people using the Internet," Krosnick Rpt. at 574, and then listed potential problems the respondents may have experienced. *See* Mot. at 17–18. *Contrast Sirko v. Int'l Bus. Machines Corp.*, 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014) (involving a survey administered by non-expert lawyer who "informed recipients that the purpose of the survey was to support a class action seeking overtime wages for employees who had been misclassified as exempt" and where the "recipients had to have been aware they would be potential beneficiaries"). Even if the survey's wording did implicate some level of bias, this would not be so substantial as to render the survey unreliable.

Defendant repeatedly cites *Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK (FEMx), 2019 WL 13088814 (C.D. Cal. May 13, 2019), where the court excluded Dr. Krosnick's

---

[2] Defendant asks the Court to strike Dr. Krosnick's declaration in support of Plaintiff's opposition, claiming it (among other things) makes arguments about blended methodologies for the first time. Reply at 7 (discussing Dkt. No. 137-1). As the Court's citations should make clear, that is not the case. And while the Court is not convinced that striking this declaration would be proper, the Court did not rely on this declaration to reach its conclusions.

United States District Court
Northern District of California

survey and expert opinion as unreliable in another case. *See, e.g.*, Mot. at 16. But *Jimenez* involved a distinguishable survey design. For example, (1) the survey "did not begin with a random sample," and it does not appear that it involved a blended sample at all; (2) Dr. Krosnick allegedly miscounted some answers that did not bear on which class members had certain experiences; and (3) deposition testimony of respondents revealed several unreliable or inaccurate answers. *See Jimenez*, 2019 WL 13088814, at \*17–\*24. This motion also occurred *after* class certification, when the survey was "being offered to prove liability and damages." *Id.* at \*25. As a result, this single, distinguishable non-binding authority does not change the outcome here.

Defendant's other arguments are unpersuasive. Even if the survey results themselves are inadmissible hearsay (a question that remains in dispute), Mot. at 21–22, that is not a reason to exclude this broader expert testimony at the class certification stage, where potentially inadmissible evidence can still be considered by the Court. *See Lytle*, 114 F.4th at 1024–25. In addition, experts may rely on inadmissible evidence when forming their opinions. Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on . . . facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). If Plaintiff seeks to introduce the survey results at trial, Defendant will be able to challenge their admissibility at that time.

In addition, Defendant argues that "nothing in Krosnick's Report can help the class members meet their individual burdens," and says these results are irrelevant because "whether any class member intends to visit a Ralph Lauren store in California . . . cannot be determined on a class-wide basis." Mot. at 22–23. This evidence is plainly relevant to estimating the size of the class, which is at least relevant to numerosity.[3] Accordingly, the Court **DENIES** the motion, Dkt. Nos. 82, 142. *Cf. Richard Paul Merrell v. Tapestry, Inc.*, No. 25-CV-02510-RGK-MAR (C.D. Cal. Mar. 30, 2026), Dkt. No. 164 (denying a nearly identical motion to exclude a similar survey from Dr. Krosnick in a similar accessibility case for similar reasons).

---

[3] Plaintiff also suggests that this evidence can be used as class-wide evidence of damages. *See* Dkt. No. 136 at 24. The Court is skeptical that this is the case, but the Court need not reach the issue because it denies certification of the 23(b)(3) class on other grounds.

United States District Court
Northern District of California

**C. Dr. William C. Easttom, II**

Defendant moves to exclude the expert opinions of Dr. William C. Easttom, II. Dkt. No. 146 ("Mot."). The motion is fully briefed: Plaintiff filed an opposition, Dkt. No. 138 ("Opp."), and Defendant filed a reply, Dkt. No. 147 ("Reply").

Dr. Easttom has "extensive experience with software development and web development": (1) he has Ph.Ds in technology and computer science, a Doctor of Science in cyber security, and multiple related master's degrees; (2) he has authored 44 computer science books and dozens of research papers and is an inventor of 27 computer science patents; and (3) he is as an adjunct lecturer at Georgetown University and Vanderbilt University. Dkt. No. 136-12 ("Easttom Rpt.") ¶¶ 2–4. He has published three books specifically on JavaScript (a coding language for web development), holds a Certified Professional in Accessibility Core Competency certification, and has taken two accessibility courses. *Id.* ¶ 5. Based on his experience and review of ralphlauren.com, Dr. Easttom concluded that, at least between January 1, 2022 and 2025, "[t]he website https://www.ralphlauren.com/ [did] not meet ADA compliance requirements for the visually impaired," "[t]hese issues would impede the ability of visually impaired customers to have access to goods or services related to the physical location," and "[t]he lack of compliance is pervasive throughout the website and not limited to just one section or one page." *Id.* ¶ 8.

Despite his extensive background, Defendant argues that "Easttom is not qualified to opine on website accessibility," since general education in computer science is not interchangeable with competence in website accessibility. Mot. at 7, 12. Defendant critiques Dr. Easttom's methods and conclusions, suggesting that they exemplify his lack of skill. *Id.* at 13–15. Defendant also spends extensive time picking apart the web accessibility experience Dr. Easttom does have, arguing that it is outdated, irrelevant, and/or insufficient. *Id.* at 15–17.

As the Ninth Circuit has previously explained, Rule 702 "contemplates a *broad conception of expert qualifications.*" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (quotation omitted) (emphasis in original). Rule 702 explicitly anticipates that an expert may be qualified through his "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702. Consequently, "an expert need not be officially credentialed in the specific

8

United States District Court
Northern District of California

matter under dispute." *See Massok v. Keller Indus., Inc.*, 147 F. App'x 651, 656 (9th Cir. 2005) (citing *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993)).[4]  Even if Dr. Easttom has a relatively limited amount of experience with website accessibility, he plainly is an expert on website design and computer science, and the Court is not persuaded that his extensive background is insufficient to qualify him as an expert.  *Cf. Pac. Steel Grp. v. Com. Metals Co.*, No. 20-CV-07683-HSG, 2024 WL 3171832, at *2 (N.D. Cal. June 25, 2024) (noting that an expert's "lack of prior experience with this particular type of project goes to the weight of his testimony rather than its admissibility").  This is especially true where Dr. Easttom *does* have training in website accessibility, including prior classes, Easttom Rpt. ¶ 5, and as an expert on this subject in a previous case, *see* Mot. at 15 (discussing *Alcazar v. Fashion Nova*, Case No. 20-CV-01434-JST (N.D. Cal.)).  Defendant's arguments about the value of each of these particular experiences goes to weight, not admissibility.

Defendant also argues that Dr. Easttom's testimony should be excluded in full because (1) his report relied on the wrong website; (2) his methodology is unreliable; and (3) he impermissibly offers legal conclusions.  Mot. at 18–28.  Most of these arguments are unpersuasive.

First, Defendant argues that Dr. Easttom failed to test a screen reader version of its website, "[d]espite being prompted to enable accessibility features."  Mot. to 18–19.  But Plaintiff offers two plausible explanations for this choice: (1) the enhanced screen reader version of the website was not available until after the end of the proposed damages class period in this lawsuit, Opp. at 15–16; Dkt. No. 136-8 (noting that UsableNet enable accessibility link would go live in US on August 23, 2023);[5] and (2) the icon to activate that enhanced screen reader version was not accessible, and a blind person would not have been able to use it in the first place, Opp. at 16–19; *see also* Dkt. No. 138-3 at 91:10–15, 99:12–100:25, 105:15–106:9, 116:1–21 (testifying that "a visually impaired person would not even know that exists; much less how to get there" and "[t]he fact that it's not findable and, in fact, two text-to-speech tools didn't even know it was there and

---

[4] This is an unpublished memorandum disposition that the Court considers for its persuasive value.

[5] Defendant does not respond to this argument.

the third one gave you no indicator of how to activate it . . . reveals it's not accessible"). The fact that Dr. Easttom didn't test an alternative, enhanced version of the website may undercut the weight of his methodology or Plaintiff's claims against Defendant, but it does not render Dr. Easttom's opinions completely irrelevant or unreliable at the class certification stage.

Second, Defendant raises various attacks on Dr. Easttom's methodology, including that Dr. Easttom (1) did not use two tools he used in another case and (2) makes a "huge inferential leap" that Defendant denied access to its goods and services from the fact that the store locator wasn't rendered as a clickable website attribute. Mot. at 19–20. First, any questions about the tools used go to weight, rather than admissibility. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) (explaining that "a slight modification of an otherwise reliable method does not render expert testimony inadmissible" (quotation omitted)). Second, the Court disagrees that Dr. Easttom's conclusions are that large of an inferential leap, or that they are irrelevant to answering the question of whether Defendant's website violated the ADA. And to the extent another expert said that visually impaired customers could locate Defendant's brick-and-mortar stores through its website, *see* Mot. at 20 (citing testimony from Aaron Cannon), that is a battle of the experts to be resolved by the trier of fact.[6]

Third, Defendant argues that Dr. Easttom improperly offers legal conclusions. Mot. at 20–22. In particular, Defendant takes issue with Dr. Easttom's statements suggesting that Ralph Lauren's website is not ADA compliant. *See, e.g.*, Easttom Rpt. ¶ 8 (noting website "does not meet ADA compliance requirements"); *id.* ¶ 106 ("Using manual examination of the web source code, as well as multiple well respected tools for scanning ADA compliance, and speech to text tools, all confirm that the website is not WCAG compliant . . . ."). Plaintiff argues that Dr. Easttom does not opine on whether Defendant's website violates the ADA or provide legal explanations, and that "experts are permitted to refer to terminology from applicable law in expressing their opinions." Opp. at 20–22.

---

[6] Defendant also says that "Easttom provides no analysis or methodology for how these conclusions were reached," Reply at 9, but this ignores the extensive explanation in Dr. Easttom's report, Easttom Rpt. ¶¶ 20–103.

The Court agrees with Defendant: Dr. Easttom's opinion and testimony that Defendant's website does not meet ADA compliance requirements, *see* Easttom Rpt. ¶ 8, is an improper legal conclusion, and the Court grants the motion as to these opinions. *See Hangarter*, 373 F.3d at 1016 ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." (emphasis in original) (quotation omitted)). However, one of the purported "legal" conclusions is actually a conclusion about whether Defendant's website complies with the Web Content Accessibility Guidelines ("WCAG"), which are "a set of international standards designed to make web content more accessible." Easttom Rpt. ¶ 11. This is not a legal conclusion just because Dr. Easttom makes reference to tools that are used for scanning ADA compliance.

Fourth, Defendant argues that Dr. Easttom "conflates Ralph Lauren's alleged non-compliance with WCAG 2.1 AA guidelines, and alleged non-compliance with the ADA," and "[t]here is no authority at all for the proposition that websites must comply with the WCAG guidelines." Mot. at 7, 22. A failure to comply with WCAG may not be dispositive of ADA non-compliance, but compliance with this common accessibility standard is certainly helpful and informative in that respect. *Cf. Alcazar v. Bubba Gump Shrimp Co. Restaurants, Inc.*, No. 20-CV-02771-DMR, 2020 WL 4601364, at *4 (N.D. Cal. Aug. 11, 2020) (holding that "whether [defendant's] website violates WCAG 2.1 standards is informative to, but not dispositive of, whether it violates the ADA").

Finally, Defendant argues that Dr. Easttom improperly used the Internet Wayback Machine to determine if historical versions of Defendant's website were inaccessible because the Wayback Machine does not necessarily include full JavaScript functionality and may "not allow a user to evaluate [a website's] full functionality." Mot. at 25. These critiques—and critiques about the sample of Wayback Machine pages that were chosen—go to weight and do not fundamentally undermine the reliability of the opinion. This is especially true where, as here, Defendant has offered no reason to believe that these individual webpages had missing JavaScript functionality. *Cf. Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1193 (W.D. Wash. 2024) ("In the absence of a specific challenge to authenticity [of the Wayback Machine materials] . . . the Court finds a

11

sufficient basis to conclude that the evidence is what [defendant] claims it is . . . .").[7]  Accordingly, the Court **GRANTS** the motion, Dkt. Nos. 84, 146, as to Dr. Easttom's improper legal conclusions and **DENIES** the motion in all other respects.  *Cf. Richard Paul Merrell v. Tapestry, Inc.*, No. 25-CV-02510-RGK-MAR (C.D. Cal. Mar. 30, 2026), Dkt. No. 163 (denying a nearly identical motion to exclude a similar report from Dr. Easttom in a similar accessibility case for similar reasons).[8]

### D.  Aaron Cannon

Plaintiff moves to exclude the declaration and expert report of Aaron Cannon.  Dkt. No. 109.  The motion is fully briefed: Defendant filed an opposition, Dkt. No. 116, and Plaintiff filed a reply, Dkt. No. 120.

Mr. Cannon has "been working in the field of web and mobile app accessibility for over seventeen years and [has] been developing software for twenty-nine years."  Dkt. No. 141-8 ("Cannon Rpt.") at 5; Dkt. No. 141-6 ("Cannon Decl.") ¶ 2.  He is a "Certified Professional in Web Accessibility" and holds multiple accessibility-related certificates.  Cannon Rpt. at 5; Cannon Decl. ¶ 2.  He is totally blind and has been using screen readers since 1988, including JAWS for Windows, NVDA, TalkBack, VoiceOver, and the Orca screen reader.  Cannon Rpt. at 5; Cannon Decl. ¶ 3.  He also co-founded and served as chief accessibility officer for a company that provided accessibility auditing of websites and mobile apps.  Cannon Rpt. at 5; Cannon Decl. ¶ 4.  Based on his review of the complaint and other literature on accessibility, Mr. Cannon concluded that "the broad array of diversity in technology configuration, ability, disability, and technical

---

[7] Defendant also makes generalized arguments about inadmissibility and lack of authentication of these records.  Mot. at 27–28.  If Plaintiff seeks to introduce these screenshots at trial, Defendant will be able to challenge their admissibility at that time.

[8] The parties request judicial notice of various court filings in conjunction with this motion.  *See* Dkt. No. 84-10 at 2; Dkt. No. 138-4 at 2; Dkt. No. 111-2 at 2.  The Court "may take judicial notice of court filings and other matters of public record."  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2010).  Accordingly, the Court **GRANTS** these requests and takes judicial notice of these filings, though not for the truth of the matters asserted within them.

Defendant also objects to Dr. Easttom's declaration in support of Plaintiff's opposition as a late-filed report.  *See* Dkt. No. 147-1.  The Court does not need to reach Dr. Easttom's arguments in his declaration to deny this motion, so the Court **TERMINATES** the objections as **MOOT**.

United States District Court
Northern District of California

experience among potential class members, makes it impossible to determine if an entire class of individuals could access a website or encountered accessibility barriers on a website without making individualized inquiries," regardless of "the state of the website itself." Cannon Rpt. at 6; *see also* Cannon Decl. ¶ 11.

Plaintiff first argues that portions of Mr. Cannon's declaration should be excluded as untimely. Mot. at 11–12 (discussing Cannon Decl. ¶¶ 9, 44–53). Under the Court's scheduling order, rebuttal expert reports for class certification were due on May 2, 2025. Dkt. No. 50. It is undisputed that Plaintiff served Dr. Easttom's and Dr. Krosnick's initial expert reports on March 28, 2025, and Defendant served Mr. Cannon's initial expert report on the same day. *See* Mot. at 7. On May 2, 2025, Defendant apparently submitted a statement explaining that "although Defendant plans to provide an expert report regarding the accessibility of its website at a future time, it will not be providing a rebuttal expert report to Easttom's expert report at this time since it does not relate to class certification and is not due." Dkt. No. 109-3 at 3. But Defendant then included a previously-undisclosed declaration from Mr. Cannon in its December 3, 2025 opposition to Plaintiff's motion for class certification, which is unquestionably responsive to Dr. Easttom's and Dr. Krosnick's expert reports. *See* Cannon Decl. ¶¶ 44–45.

Plaintiff seeks exclusion under Federal Rules of Civil Procedure 26 and 37. Mot. at 11–12. Under Rule 26, a party "must make [their expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id.* 26(e)(1); *see also id.* 26(e)(2) (noting that this duty "extends both to information included in the report and to information given during the expert's deposition"). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." *Id.* 37(c)(1). "Rule 37(c)(1) gives teeth to [the disclosure] requirements by forbidding the use at trial of any

13

information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). "[T]he burden is on the party facing sanctions to prove harmlessness." *Id.* at 1107.

Defendant does not appear to dispute that the declaration excerpts are a combination of new and rebuttal opinion. Instead, Defendant argues that this additional information goes to the merits, the expert deadline for which has not yet passed, and it only included this declaration because "Plaintiff included extensive argument and opinions from Easttom going to the merits of the case (specifically, website accessibility)." Opp. at 14; *see id.* at 18 (claiming that Defendant "could not let these egregiously inaccurate opinions go unnoticed by the Court"). It is difficult to understand how Defendant can argue that these arguments only go to the merits, while simultaneously asking the Court to consider them in connection with the motion for class certification. *See* Dkt. No. 141 at 11, 21 (citing these excerpts to refute predominance and Dr. Krosnick's purported class-wide evidence). Defendant cites no cases that support its approach or interpretation, and the Court concludes that these opinions are a mix of untimely rebuttal and improper supplemental expert opinions.[9] In either case, these opinions should have been disclosed at the appropriate long-passed expert deadlines. *Cf. Fed. Deposit Ins. Corp. v. Van Dellen*, No. CV 10-4915 DSF (SHX), 2012 WL 12886825, at *2 (C.D. Cal. Nov. 6, 2012) (striking additional report that was "more in the nature of a rebuttal" and was disclosed months after the expert discovery cutoff dates); *Rovid v. Graco Children's Prods. Inc.*, No. 17-CV-01506-PJH, 2018 WL 5906075, at *11 (N.D. Cal. Nov. 9, 2018) (noting that "supplemental report [that] attempts to strengthen or deepen opinions in light of [the expert's] opponent's challenges to the analysis and conclusions therein" is "the exact type of supplemental report that the Ninth Circuit and courts across this Circuit have held should be excluded or struck under Rule 37(c)" (quotation omitted)).

Defendant argues that Mr. Cannon disclosed that he had new opinions in his deposition,

---

[9] Mr. Cannon suggests that these new opinions were partially formed after reviewing the deposition transcripts from Dr. Easttom and Dr. Krosnick. *See* Cannon Decl. ¶¶ 9, 44. While those depositions took place after the rebuttal cutoff, none of Mr. Cannon's new opinions appear to relate to opinions that were mentioned for the first time in the depositions, and there is no evidence that Mr. Cannon couldn't have provided these rebuttal opinions by the Court-imposed deadline.

14

United States District Court
Northern District of California

yet Plaintiff "did not question him about those additional opinions." Opp. at 15. Defendant states that "federal case law routinely denies motion[s] to strike expert reports where a party had the ability to explore the opinions, and refused to do so." *Id.* at 17. Here, Mr. Cannon told Plaintiff's counsel in his August 8, 2025 deposition that he had new opinions based on Mr. Easttom's reports. Dkt. No. 116-5 at 37:12–40:8 (stating that he had opinions that were not in his report because he "was unaware of the facts that would allow [him] to reach those opinions"); *id.* at 40:2–8 (stating that the new facts were Mr. Easttom's report and rebuttal). Plaintiff's counsel asked Mr. Cannon to "[t]ell me the new opinions that you have that are not part of your report," and Mr. Cannon stated that "I don't know that I could list them all off. I can give you a general summary. I can't promise – I can guarantee you it won't be all-inconclusive [sic]." *Id.* at 39:10–15.

The Court finds that Defendant has not shown harmlessness. Defendant's argument appears to be that Plaintiff's counsel should have pushed harder at the deposition, ignoring the fact that Mr. Cannon evasively and vaguely mentioned he had some unspecified other opinions, but would not explain what they were. This is especially true where Defendant had already asserted that it would not disclose its rebuttal opinions to Dr. Easttom's report, which it did not perceive to be related to class certification. As a result, the Court rejects Defendant's suggestion that Plaintiff had the same "free rein" to get additional discovery on these untimely opinions as in Defendant's cited cases. *See MasterObjects, Inc. v. Meta Platforms, Inc.*, No. C 21-05428 WHA, 2022 WL 4856269, at *5 (N.D. Cal. Oct. 3, 2022); *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014) (noting that argument that first opinion placed party "on notice" of undisclosed argument was "troubling because . . . [the opposing party] was entitled to a *complete* disclosure of all opinions—not a sneak preview of a moving target" (emphasis in original)).

Defendant's other arguments regarding a lack of prejudice or surprise are unpersuasive. *See* Opp. at 19. Defendant summarily states that Plaintiff only cites a "single distinguishable case" supporting his claims of prejudice, and "Plaintiff has also not identified any additional expenses caused by Defendant's alleged failure to disclose, because there is none." *Id.* This flips the burdens: it is Defendant's burden to demonstrate harmlessness or substantial justification, and it has not done so. Accordingly, the Court will strike the identified portions of Mr. Cannon's

15

declaration, Cannon Decl. ¶¶ 9, 44–53, though those portions would have been irrelevant to the remainder of the Court's order here.  *Cf. Fed. Deposit*, 2012 WL 12886825, at *2; *In re Toy Asbestos Litig.*, No. 19-CV-00325-HSG, 2020 WL 8815916, at *3 (N.D. Cal. May 27, 2020) ("Defendant appears to have supplemented its . . . expert's report only once it reviewed *other* expert reports[.] . . . But this iterative approach invites gamesmanship and the Court's expert discovery deadlines would be rendered merely advisory were this permitted." (emphasis in original)).[10]

Plaintiff next argues that Mr. Cannon's testimony should be excluded in full because (1) his opinions are not based on sufficient facts or data; (2) he did not apply a reliable, testable method to the case; (3) his class certification opinions are unhelpful; (4) his opinions offer impermissible legal conclusions; and (5) he is not qualified to offer "socioeconomic and population-level opinions or reliability engineering opinions."  Mot. at 13–21.

In particular, Plaintiff first argues that Mr. Cannon's opinion should be excluded because he did not "gather any site-specific facts about Ralph Lauren's website" and instead "offer[ed] generalized assumptions based on experience, which Rule 702(b) does not permit."  *Id.* at 13, 15. But the Ninth Circuit has made clear that "[w]hen evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience."  *Sandoval-Mendoza*, 472 F.3d at 655 (quotation omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (noting that reliability can be found when "an expert . . . draw[s] a conclusion from a set of observations based on extensive and specialized experience"). The Court finds that Mr. Cannon's opinions about what individualized technical problems may impede a user with a screen reader from accessing a website are adequately based upon his extensive personal knowledge and experience.  To the extent Plaintiff believes Mr. Cannon's testing was flawed or didn't consider enough data or site-specific information, *see* Mot. at 13–15,

---

[10] The Court does not strike the remainder of the declaration, which does not appear to contain new argument.  *Cf. Plexxikon Inc. v. Novartis Pharms. Corp.*, No. 17-CV-04405-HSG, 2020 WL 1325068, at *3 (N.D. Cal. Mar. 20, 2020) (taking same approach).  The Court also strikes the same portions of the substantively identical declaration submitted with Defendant's motion to exclude Dr. Easttom's expert opinions, originally filed as Dkt. No. 84-1.  *See* Mot. at 8 n.1.

United States District Court
Northern District of California

those critiques go to weight, not admissibility.

The same is true for Plaintiff's arguments that Mr. Cannon did not deploy a reliable methodology. *See id.* at 15–19. Plaintiff argues that Mr. Cannon "conducted no testing to support any of [his] conclusions" and he "cannot point to any objective standard, research, or validation supporting the method he used to reach his opinions." *Id.* at 16–17. But Plaintiff misconstrues Mr. Cannon's evidence, which is not relying on a statistical study to show exactly how many individuals exhibit particular behaviors. Instead, Mr. Cannon is applying his extensive experience with accessibility-related software and screen readers to make high-level observations about, for example, the differences in hardware, operating systems, and screen reader software, in order to explain why this Court would have to engage in individualized inquiries about each class members' experience. *Cf. Hangarter*, 373 F.3d at 1017 ("Concerning the reliability of non-scientific testimony . . . the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." (quotation omitted) (emphasis in original)). This is plainly relevant to the Court's predominance inquiry, and the reliability of these observations does not inherently depend on any precise scientific methodology. Plaintiff's critiques, such as the lack of analysis of Defendant's specific website and the absence of clear statistical conclusions, go to the weight of this evidence.

The Court finds that none of Plaintiff's other arguments show that Mr. Cannon's opinions lack a "reliable foundation" or "relevan[ce] to the task at hand" for purposes of class certification. *Daubert*, 509 U.S. at 597; *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) ("The judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." (quotation omitted)). The Court finds that Mr. Cannon's opinions are not so inherently unreliable or irrelevant that they should be excluded at the class certification stage. *Cf. Sali*, 909 F.3d at 1006 (noting that the Ninth Circuit "license[s] greater evidentiary freedom at the class certification stage").

The Court also disagrees that Mr. Cannon's opinions "substitute legal judgment for technical analysis." Opp. at 20. The fact that Mr. Cannon is identifying individualized issues in a

17

user's experience with accessibility features—a central part of the predominance inquiry—does not mean that he is impermissibly making legal conclusions. Mr. Cannon's opinion discusses what the individualized differences are, not how they do or don't satisfy Rule 23. As a result, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion to strike and exclude the expert report and declarations of Aaron Cannon, Dkt. No. 109.

### III.    MOTION FOR CLASS CERTIFICATION

Pending before the Court is Plaintiff's motion for class certification. Dkt. No. 136 ("Mot."); Dkt. No. 141 ("Opp."); Dkt. No. 139 ("Reply"). The Court held a hearing, Dkt. Nos. 125 (minute entry), 135 ("Tr."), and now **GRANTS IN PART** and **DENIES IN PART** the motion.

#### A.  Legal Standard

Federal Rule of Civil Procedure 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) applies where there is both "predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy." *Id.* 23(b)(3).

Where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). Plaintiff bears the burden of demonstrating that common questions will predominate over individual ones under Rule 23(b)(3) by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). The Court considers whether Plaintiff has demonstrated that "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," or if "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453 (quotation omitted).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Courts "must take the substantive allegations of the complaint as true" but "need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010).

### B. Rule 23(a) Factors

#### 1. Numerosity

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "As a general rule, classes numbering greater than forty individuals satisfy the numerosity requirement." *Pardi v. Tricida, Inc.*, No. 21-CV-00076-HSG, 2024 WL 4336627, at *4 (N.D. Cal. Sept. 27, 2024) (quotation omitted). "Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied." *In re HiEnergy Techs., Inc. Sec. Litig.*, No. 04-CV-01226-DOC, 2006 WL 2780058, at *3 (C.D. Cal. Sept. 26, 2006) (quotation omitted).

19

Plaintiff's expert estimates that "at least 3,243 legally blind Californians using screen readers visited ralphlauren.com between January 1, 2022 and July 31, 2023 and encountered accessibility issues that prevented access to the goods or services of Raph Lauren's physical stores." Mot. at 14 (discussing Krosnick Rpt. ¶¶ 13, 147–49). This would easily clear the threshold for numerosity for the California subclass and the broader nationwide class.

Defendant argues that "the methodology used by Krosnick is fatally flawed and unreliable" for the same reasons discussed in the context of its motion to exclude Dr. Krosnick. Opp. at 27. The Court disagrees. As discussed above, Dr. Krosnick deployed a survey involving a blended sample of 1,641 "vision-impaired adults." Krosnick Rpt. ¶ 59; *id.*, App'x E at 239–40. Respondents were told "a list of [example] problems that people might have when trying to use web pages to do business with a company"—for instance, "[a] video plays, but what is shown in the video is not described"—and any respondents "who said they were aware of Ralph Lauren were asked if they ever had one or more problems accessing the Ralph Lauren web page in ways that prevented them from doing business with a Ralph Lauren store." Krosnick Rpt. ¶¶ 130–31. Defendant argues that only 180 respondents said they had heard of Ralph Lauren, roughly 23 indicated that they had experienced web page problems that prevented them from doing business with Ralph Lauren, and only six said they had ever lived in California since 2018 and were prevented from doing business with a Ralph Lauren store. *See* Opp. at 11 (discussing these numbers); Dkt. No. 141-5 (excerpts of Krosnick's data).

Defendant picks off individual respondents and generally argues about the persuasiveness of Dr. Krosnick's methodology, but the bar for numerosity is low, Dr. Krosnick was able to identify at least six potential California class members in a sample of 1,600 visually impaired adults nationwide, and Dr. Krosnick would need to be off by almost a factor of 100 for the California subclass size to be below 40.[11] In light of this survey evidence, and supporting evidence that the number of visits to Defendant's website during the class period is "somewhere north of 2 billion," Dkt. No. 136-4 at 38:18–22, "common-sense assumptions and reasonable

---

[11] For reference, Dr. Krosnick estimates that there are roughly 744,560 visually impaired adults in California alone. *See* Krosnick Rpt. ¶ 146.

United States District Court
Northern District of California

inferences" indicate that the numerosity threshold is satisfied, *see West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (quotation omitted).

Defendant's other arguments are unpersuasive. First, Defendant relies on *Celano v. Marriott International, Inc.*, 242 F.R.D. 544 (N.D. Cal. 2007). *See* Opp. at 27–28. That case is distinguishable because the plaintiffs had not offered a reasonable way to extrapolate a class size greater than 40 members from (1) 21 declarations of individuals who wished to play golf on an allegedly inaccessible course; and (2) general census and membership data about the number of disabled golf players. *See Celano*, 242 F.R.D. at 549–51. The court found that the statistical data "at most shows that some disabled golfers were deterred from playing golf," but was concerned that "plaintiffs' data provide[d] no insight into how many disabled people who would like to play golf, at Marriott courses, are deterred from doing so because of the absence of single-rider cars." *Id.* at 549–50. That is exactly the type of statistical surveying that Plaintiff *has* offered here, through an at least partially representative sample that asked whether certain accessibility problems on Defendant's website prevented respondents from doing business with a Ralph Lauren store.

Second, Defendant states that "89.5% of the respondents did not encounter web page problems." Opp. at 27. But this does not show that fewer than 40 class members encountered these problems, just that many of the millions or billions of site visitors did not. Defendant also argues that "Plaintiff has failed to show that the class is ascertainable," *id.* at 28, but "Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification," *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017).

### 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). An individual question is one where "members of a proposed class will need to present evidence that varies from member to member,"

21

United States District Court
Northern District of California

while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (quotation omitted). What matters to class certification is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted). Even a single common question can establish commonality. *Id.* at 359.

There is at least one common question in this case, including whether Defendant's website complies with WCAG standards and whether violations of WCAG standards can constitute ADA and Unruh Act violations. *See* Mot. at 15–16; *cf. Alcazar v. Fashion Nova, Inc.*, No. 20-CV-01434-JST, 2022 WL 19975445, at *3 (N.D. Cal. Sept. 6, 2022) ("Whether [defendant's] website complies with [national and state disability discrimination laws] or whether it violates them can be answered in one fell swoop."). Defendant states that "[a]ny adjudication of website accessibility would have to be done [on] a web-page by web-page basis and there is no easy way to determine whether a particular page or feature is compliant." Opp. at 31. But this is an argument better considered at the predominance stage: given clear commonalities in the code and components across the entire website, *see* Dkt. No. 136-4 at 36:1–38:17 (explaining that Ralph Lauren's code base uses shared templates, tags, patterns, components, and code), there will be at least some common questions regarding whether certain features were or weren't accessible for class members, and whether such barriers violated the ADA and Unruh Act.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). In assessing typicality, the Court looks at whether Plaintiff is the proper party to proceed with the suit. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158 & n.13 (1982). That said, under the "permissive standards" of Rule 23(a)(3), the claims "need not be

substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (quotation omitted).

Plaintiff here is typical because he, like all class members, is a "legally blind individual[] who ha[s] encountered or continue[s] to encounter unlawful access barriers on the Defendant's website." Mot. at 16*; see also* Dkt. No. 136-1 ("Merrell Decl.") ¶ 14.[12] Defendant argues that "Plaintiff has not offered any evidence that any class member encountered the same web pages he did or had a similar experience." Opp. at 30. This disregards Plaintiff's evidence that many of the accessibility issues on Defendant's website were common across subpages and website components. *See* Dkt. No. 136-4 at 36:1–38:17; Easttom Rpt. ¶¶ 78, 111 ("Every subpage I checked had the same accessibility issues I had found on the main page."). Plaintiff's claims "need not be substantially identical" to other class members' claims, and he is not required to prove that he experienced identical issues on identical pages to satisfy typicality. *See Hanlon*, 150 F.3d at 1020.

### 4. Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must address two legal questions: (1) whether the named Plaintiff and his counsel have any conflicts of interest with other class members; and (2) whether the named Plaintiff and his counsel will prosecute the action vigorously on behalf of the class. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). This inquiry "tend[s] to merge" with the commonality and typicality requirements. *Gen. Tel. Co.*, 457 U.S. at 157 n.13. In part, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

___

[12] Defendant asks the Court to strike Plaintiff's declaration as a sham declaration that contradicts his deposition testimony, and it raises several other evidentiary objections. *See* Dkt. No. 141-11. The Court disagrees that "the disparity between the affidavit and deposition is so extreme that the [C]ourt must regard the differences between the two as contradictions" and strike this as a sham declaration. *Yeager v. Bowlin*, 693 F.3d 1076, 1080–81 (9th Cir. 2012). The Court also **OVERRULES** the remaining objections, though nothing in this declaration is essential to the Court's holding here.

Plaintiff contends that he has worked and will work diligently to protect class members' interests, there are no apparent conflicts of interest, and counsel has substantial experience in litigating class actions under the ADA and Unruh Act. *See* Merrell Decl. ¶¶ 12–14; Dkt. No. 136-3 ¶¶ 4–6, 15–22 (declaration from counsel).[13] Defendant argues that "Plaintiff testified that he left the Website after he browsed a few products, he did not try to book an appointment, look for directions, or schedule an in-store pickup and thus has failed to show a nexus to a physical store." Opp. at 29. These arguments may be relevant in attacking Plaintiff's claims and credibility at a later stage, but they are not enough here to suggest that he has conflicts with other class members or will not vigorously represent the class in this action. *See Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) ("Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.").[14]

Defendant also suggests that Plaintiff lacks standing and is accordingly inadequate because he "testified that he has no plans to return to the Website even if it were accessible." *Id.* However, this mischaracterizes the deposition testimony, and Plaintiff has introduced sufficient competing evidence at this stage to show that he would return to Defendant's website and has standing for injunctive relief. *See* Dkt. No. 141-3 ("Merrell Dep.") at 65:24–25 ("If the website gets fixed, I plan to go back and make a purchase, possibly."); Merrell Decl. ¶ 11 ("If the Defendant's website is made accessible, I intend to return to complete a purchase and to visit a store, including utilizing the in-store pickup and appointment functions to make purchases in the

---

[13] Defendant objects to two paragraphs in this declaration, where Plaintiff's counsel states that Exhibit 9 (Dr. Easttom's report) and Exhibit 11 (Dr. Krosnick's report) are attached to the motion as "true and correct cop[ies]." *See* Dkt. No. 141-10. The Court assumes that Defendant is objecting to the contents of these exhibits, as it does in its motions to exclude, though it is not entirely clear. The Court has already addressed those arguments, and it otherwise **OVERRULES** these objections.

[14] This is also a potential argument against typicality. *See Hanon*, 976 F.2d at 508 (noting that plaintiff's "unique background and factual situation require[d] him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class"). However, the Court is unpersuaded that these kinds of factual challenges to Plaintiff's past or future intent to interact with a physical store are any different than the challenges that will be brought against other class members.

future.").

Defendant also argues that "Plaintiff does not know basic information about this case, such as how many classes he is seeking to certify, what the class periods are, what motions have been filed, whether the class has been certified, who he is seeking statutory damages on behalf of, whether he is seeking an injunction, what relief he is seeking, or how many claims he has asserted." Opp. at 29. But "the named plaintiff need not have specific knowledge of the material facts in support of his claim." *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 583 (N.D. Cal. 2021); *see also In re Intuitive Surgical Sec. Litig.*, No. 13-CV-1920 (EJD), 2016 WL 7425926, at *7 (N.D. Cal. Dec. 22, 2016) ("The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of [his] claim [ ] and will be deemed inadequate only if [he] is startingly unfamiliar with the case." (quotation omitted)). While Plaintiff may not know certain legal details of the underlying litigation, such as the class definition or the legal remedies sought, he (1) appeared for a deposition in this case, Merrell Decl. ¶ 12; (2) invested several hours on the case before that time, Merrell Dep. at 53:24–25; and (3) acknowledges his responsibility to "participat[e] in the process and advocat[e] for the best outcome for the website that benefits the entire class, and making sure to . . . give information [to] the best of [his] ability," *id.* at 55:5–9. This is enough to satisfy adequacy. *Cf. In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531 (N.D. Cal. 2010) ("Plaintiffs are laypersons and cannot be expected to define the scope of the class or name all of the causes of action in more precise terms. The fact that they are familiar with the basis for the suit and their responsibilities as lead plaintiffs is sufficient to establish their adequacy.").

### 5. Supplemental Briefing on JAWS

After the Court held a hearing on this motion, Defendant filed a motion for leave to file supplemental briefing. Dkt. No. 126. Defendant accused Plaintiff of lying about his use of the JAWS screen reader software, as revealed in a filing in another case brought by Plaintiff, *Merrell v. Marriott International, Inc.*, No. 23-CV-06664-WHO (N.D. Cal. Feb. 9, 2026), Dkt. No. 114 ("Examiner's Rpt."). *See* Dkt. No. 126 at 2. The Court granted both parties leave to file supplemental briefing. *See* Dkt. No. 128.

United States District Court
Northern District of California

In its supplemental briefing, Defendant argues that Plaintiff "repeatedly stated under oath that he used JAWS software to visit the subject websites." Dkt. No. 129 at 3; *see, e.g.*, Dkt. No. 126-3 at 7 ("Q: And which screen reader were you using during your May 15th visit? A: JAWS for windows."). However, a neutral examiner inspected Plaintiff's Dell computer in the *Marriott* action and concluded that "the screen reader software JAWS was NOT identified [in] the computer evidence during the period reviewed between January 1, 2022, and the date of inspection (November 24, 2025, to [January 2026])." Dkt. No. 129 at 4 (quoting Dkt. No. 126-2 at 12). Defendant argues that "Merrell's lies go to the very foundation of his claims" and call into question his typicality and standing, along with the adequacy of Plaintiff and his counsel. Dkt. No. 129 at 2, 5–6.

Plaintiff argues that (1) the examiner's report also found evidence that ZoomText was present on Plaintiff's computer; (2) ZoomText is a screen reading software; and (3) "[b]ecause ZoomText is a screen reader and Plaintiff seeks to represent screen reader users, there is no basis for the Court to second guess appointing Merrell as a typical class representative nor question his standing or adequacy. Dkt. No. 130 at 2.[15] Plaintiff introduces evidence that ZoomText is a screen reader, including an additional declaration from his expert, Dkt. No. 127-2 ¶ 3 ("Zoom Text . . . also provides text-to-speech functionality."), excerpts from the neutral examiner's report, Examiner's Rpt. at 10 ("The screen reader software 'ZoomText' was identified on the computer evidence."), and a video showing the similarities between the screen-reading capabilities of ZoomText and JAWS, Dkt. No. 130-2 ¶ 7.

Though Plaintiff first argued that ZoomText was a screen reader in his opposition to the motion for leave to file supplemental briefing, Defendant does not attempt to refute this argument in its supplemental briefing. As a result, while there is evidence suggesting that Plaintiff used ZoomText rather than JAWS to browse Defendant's website, there is is no evidence on the record

---

[15] Plaintiff tries to cast doubt on the examiner's report by arguing that "the examiner's report, if thorough, should have located JAWS artifacts," even if Plaintiff's computer only had ZoomText. Dkt. No. 130 at 3. This is not particularly persuasive given that Plaintiff does not refute the examiner's claim that he was using ZoomText, rather than JAWS. If anything, Plaintiff's supplemental declaration stating that he considers ZoomText and JAWS to be interchangeable, Dkt. No. 127-4, suggests that he may have been using ZoomText.

United States District Court
Northern District of California

suggesting that this fact alone—or the fact that Plaintiff may have used a different screen reader than other class members—defeats Plaintiff's standing or typicality.

The Court also concludes that this evidence does not render Plaintiff or his counsel inadequate. The inconsistency in testimony here is not "so sharp as to jeopardize the interests of absent class members." *See Harris*, 753 F. Supp. 2d at 1015. Plaintiff alleges in a supplemental affidavit that he "refer[s] to the screen-reading functionality of ZoomText on [his] computer as JAWS and . . . ZoomText and JAWS are essentially indistinguishable to [him] by how they function and sound." Dkt. No. 127-4 ¶ 3. For the time being, the Court has no reason to doubt the validity of that statement. It may also be the case that Plaintiff simply made a mistake in his testimony, and he correctly points out that there is nothing obvious that he had to gain by misrepresenting which screen-reading software he used. In addition, the Court has no reason to impute this mistake to Plaintiff's counsel at this stage. *Cf. Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG (KSX), 2016 WL 5920345, at *4–*5 (C.D. Cal. June 23, 2016) (finding adequacy of counsel despite argument that counsel allowed plaintiff to submit allegedly conflicting interrogatory responses). These facts may establish a basis for future impeachment of Plaintiff's testimony, and the Court advises Plaintiff and his counsel that misleading or incorrect representations in the future will have substantial negative consequences for their case. But this is not a basis for denial of the motion for class certification.

### C.  23(b) Factors

#### 1.  23(b)(2) Class

"Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Dukes*, 564 U.S. at 360 (quoting Fed. R. Civ. P. 23(b)(2)). "[U]nlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 587 (N.D. Cal. 2015). Instead, the "key" to finding a class under Rule 23(b)(2) "is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or

declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (quotation omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant" or "to an individualized award of monetary damages." *Id.* at 360–61 (emphasis in original).

The Ninth Circuit has further explained that Rule 23(b)(2)'s requirements are "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (quotation omitted). Where all members of the putative class are allegedly exposed to harm from a specified set of centralized policies and practices, a defendant is alleged to have "acted or refused to act on grounds that apply generally to the class." *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

That reasoning applies here. Plaintiff has not brought claims that must be redressed through individual injunctions. Rather, a single, indivisible injunction ordering Defendant to bring its website into compliance with the ADA "would provide relief to each member of the class" and thus satisfy Rule 23(b)(2). *Dukes*, 564 U.S. at 360. Moreover, as the Ninth Circuit has made clear, "the primary role of [Rule 23(b)(2)] has always been the certification of civil rights class actions." *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). In these cases, the fact that the alleged discriminatory conduct may have affected different members of the class in different ways does not prevent certification under Rule 23(b)(2). *See id.* at 688 (noting that the fact that "policies and practices may not affect every member of the proposed class and subclass in exactly the same way" did not defeat certification); *Davis v. Lab'y Corp. of Am. Holdings*, No. CV 20-0893 FMO (KSX), 2022 WL 22855520, at *6–*7 (C.D. Cal. June 13, 2022) (same).

Defendant argues that "the website comprises of [sic] over 16,000 pages" and "[a]though there are some common features that appear on more than one page, there are still thousands of features and any adjudication of website accessibility and injunctive relief would have to be done on a web-page by web-page basis." Opp. at 26. But the Court can easily conceive of a blanket injunction that would provide relief to every class member. For example, the Court could "order compliance with WCAG [standards] as an equitable remedy if, after discovery, the website . . .

28

United States District Court
Northern District of California

fail[s] to satisfy the ADA." *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 907 (9th Cir. 2019); *cf.* FAC ¶ 43 (seeking injunction requiring Defendant to "retain a qualified consultant . . . to assist Defendant to comply with WCAG 2.1 guidelines for Defendant's website," with consultant helping with training Defendant's employees, regularly checking accessibility under WCAG 2.1 guidelines, and developing an accessibility policy that is clearly disclosed).

Defendant relies on *Castaneda v. Burger King Corp.*, 264 F.R.D. 557 (N.D. Cal. 2009), for its position that a 23(b)(2) class is improper. Opp. at 26. There, the court was concerned about ordering injunctive relief across 92 Burger King stores because "final common injunctive relief would only be appropriate as to those stores where there are in fact accessibility violations, and the relief would even then vary from location to location." *Castaneda*, 264 F.R.D. at 569. Notably, the "plaintiffs ha[d] failed to make the case that [defendant] ha[d] any common offending policies or design characteristics that called for common accessibility barriers at different restaurants." *Id.* at 568. This led the court to conclude that there was a lack of typicality and commonality, in addition to a lack of appropriate injunctive relief. *See id.* at 568–72. In contrast, and as discussed above, Plaintiff *has* shown some "common architecture, plans, remodels, policies, or barriers to access" here. *Id.* at 571–72. Though that may not be enough to carry the day for predominance below, it is enough to satisfy Rule 23(b)(2). Accordingly, the Court **GRANTS** Plaintiff's request to certify his Rule 23(b)(2) class.

### 2. 23(b)(3) Class

#### a. Predominance

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods*, 577 U.S. at 453 (quotation omitted). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quotation omitted). The Supreme Court has defined an individual question as "one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same

29

evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quotation omitted). This "inquiry asks whether the common, aggregation-enabling[] issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quotation omitted). The predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34.

"[C]onsidering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Olean*, 31 F.4th at 665 (quotation omitted). Plaintiff's underlying claim for his 23(b)(3) class is Defendant's alleged violation of § 51(f) of the Unruh Act. *See* FAC ¶¶ 24, 65–71; Mot. at 8. "Under the plain language of California Civil Code § 51(f), a violation of the ADA is automatically, without more, a violation of the Unruh Act." *Arroyo v. Rosas*, 19 F.4th 1202, 1214 (9th Cir. 2021).[16] Here, Plaintiff alleges that Defendant "is denying visually impaired customers the services provide by [Defendant's] website," and that Defendant's conduct "constitutes a violation of various provisions of the ADA" and is actionable under the Unruh Act. *See* FAC ¶¶ 22–24, 66–67.

Plaintiff's predicate ADA claim is for a violation of Title III. *See id.* ¶¶ 60–64. Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). The Ninth Circuit has previously explained that "[t]he alleged inaccessibility of [a company's] website" can give rise to a Title III violation because that inaccessibility "impedes access to the goods and services of [the company's] physical [] franchises—which are places of public accommodation." *See Robles*, 913 F.3d at 905; *see also* 42 U.S.C. § 12182(b)(2)(A)(iii) (defining discrimination to include "failure

---

[16] While "injunctive relief . . . is the only relief available to private plaintiffs under the ADA," *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc), "the net practical consequence [of § 51(f)] is to create a state law cause of action that permits, for California-based ADA claims, a damages remedy that is not available under the ADA," *Arroyo*, 19 F.4th at 1206.

30

United States District Court
Northern District of California

to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services"); 28 C.F.R. § 36.303(c)(1) ("A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."). "To prevail on a discrimination claim under Title III, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of his disability." *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010).

For a disability discrimination claim, "it is not necessary for [Article III] standing purposes that the barrier completely preclude the plaintiff from entering or from using a facility in any way." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 947 (9th Cir. 2011). Instead, Plaintiff must only demonstrate that the barrier "interfere[s] with [his] 'full and equal enjoyment' of the facility." *Id.* (quoting 42 U.S.C. § 12182(a)). Similarly, "[a] plaintiff suffers injury—and therefore has [statutory] standing—under the Unruh Act if he is 'the victim of [a] defendant's discriminatory act.'" *Gilbert v. 7-Eleven, Inc.*, 157 F.4th 1057, 1064 (9th Cir. 2025) (quoting *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 175 (2007)).

Plaintiff argues that common questions predominate because "[t]he core liability question is whether Defendant's uniform coding practices failed to provide blind users equal access to store-linked services," and that question can be answered with Dr. Easttom's class-wide evidence of "missing alt text, non-discernible link text, unlabeled form elements, and non-keyboard-accessible controls across the site and throughout the class period." Mot. at 20. In addition, "whether the inaccessible website impeded access to the goods and services of the physical stores[] is also common" because "the functional relationship between these flows and the stores is the same for every patron." *Id.* at 20–21. To Plaintiff, the fact that "individual class members' navigation paths differ, that screen readers behave differently, or that some pages improved over time" is of no moment, since these "immaterial individual variations" do not predominate, and "liability here turns entirely on system-wide code and uniform policies, not on individual

31

browsing experiences." *Id.* at 21; *see also* Dkt. No. 136-4 at 36:1–38:17 (explaining that Ralph Lauren's code base uses shared templates, tags, patterns, components, and code). Plaintiff further contends that Article III injury and Unruh Act entitlement can be determined with common evidence, since each class member has standing the moment they "ha[ve] encountered or become aware of [an] alleged ADA violation[] that deter[red] [their] patronage of or otherwise interfere[d] with [their] access to a place of public accommodation." *Id.* at 23 (quoting *Chapman*, 631 F.3d at 947).[17]

Defendant argues that a number of individualized issues will predominate over class-wide issues of liability and damages, including: (1) whether each class member is disabled; (2) what web pages the class member visited; (3) whether those particular web pages were non-compliant; (4) whether that non-compliance impeded the class member's full and equal access to a physical Ralph Lauren store; (5) whether the class member possessed a bona fide intent to use Defendant's services; and (6) whether individualized circumstances (such as the screen reader, operating system, or browser used) were the cause of the class member's problems. *See* Opp. at 20–21. Defendant emphasizes that each class member will need to show that (1) they were "denied full and equal access such as by showing that [they] suffered 'embarrassment, humiliation, or discomfort' as a result of the violation"; and (2) they had a bona fide intent to purchase Defendant's products or use its services. *See id.* at 15 (quotation omitted).

On one hand, the Court agrees with Plaintiff, Reply at 8 n.6, that the class members here do not need to show that they encountered "difficulty, discomfort, or embarrassment" to prevail on their particular Unruh Act claim. That is because the "difficulty, discomfort, or embarrassment" requirement is found in California Civil Code § 55.56, which applies only to construction-related accessibility claims. *See Davis*, 2022 WL 22855520, at *10. Plaintiff is not bringing a

---

[17] Plaintiff also confusingly suggests that Dr. Krosnick's survey can "provide common, classwide proof of impact and incidence," apparently arguing that he can calculate the number of injured class members, multiply that value by the statutory minimum to calculate damages, and then use a claims process to "determine how to slice the fixed statutory damages fund." Mot. at 23–24. When asked at oral argument which Rule 23 factors this survey would go to, Plaintiff's counsel said that it is relevant to numerosity, typicality, commonality, intent, and "to establish injury." Tr. at 10:12–14:4. The Court remains unconvinced that this survey is class-wide evidence of anything besides numerosity, but the Court need not conclusively resolve that issue here.

construction-related claim, so this requirement does not apply. *See Davis v. Lab'y Corp. of Am. Holding*s, No. 22-55873, 2024 WL 489288, at *2 (9th Cir. Feb. 8, 2024) (noting that "difficulty, discomfort, or embarrassment are required to recover damages only in construction-related Unruh Act claims," and "[b]ecause this case concerns effective communication and not construction, such a showing for each plaintiff is not required");[18] *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1197 (N.D. Cal. 2023) ("*Stiner I*") (coming to same conclusion).

This is an important distinction, since most of Defendant's cited cases, Opp. at 14–19, involved construction-related Unruh Act claims, and at least one of those cases explicitly found a lack of predominance because of the "difficulty, discomfort, or embarrassment" requirement. *See, e.g.*, *Stiner v. Brookdale Senior Living, Inc.*, No. 17-CV-03962-HSG, 2024 WL 3498492, at *12 (N.D. Cal. July 22, 2024) ("*Stiner II*") (finding that "determining whether a given barrier caused a class member injury in the form of 'difficulty, discomfort or embarrassment' is an individualized inquiry that predominates over the common issues"); *Doran v. 7-Eleven, Inc.*, 509 F. App'x 647, 648 (9th Cir. 2013) (noting plaintiff had not shown "that he personally encountered the violation and experienced difficulty, discomfort, or embarrassment" (quotation omitted)); *Moeller v. Taco Bell Corp.*, No. C 02-5849 PJH, 2012 WL 3070863, at *1 (N.D. Cal. 2012) (challenging architectural barriers at Taco Bell restaurants); *Vondersaar v. Starbucks Corp.*, No. CV 12-05027 DDP (AJWx), 2015 WL 629437, at *1 (C.D. Cal. 2015*), aff'd*, 719 F. App'x 657 (9th Cir. 2018) (discussing inaccessible pick-up counters at Starbucks).

On the other hand, the Court agrees with Defendant that each class member must demonstrate a bona fide intent. The "bona fide intent" requirement was primarily discussed by the California Supreme Court in *White v. Square, Inc.*, 7 Cal. 5th 1019 (2019), which addressed "whether standing under the [Unruh] Act extends to a plaintiff who intends to transact, but has not yet transacted, with an online business." *Id.* at 1026. The plaintiff was a bankruptcy attorney who "intended to use Square's services for his bankruptcy practice" but believed he was not permitted to do so under its terms of service. *Id.* at 1023–24. He brought an Unruh Act claim under § 51(b)

---

[18] This is an unpublished memorandum disposition that the Court considers for its persuasive value.

United States District Court
Northern District of California

and argued that Square's terms denied bankruptcy attorneys full and equal access to its services. *Id.* Square argued that the plaintiff did not have standing and had "mere knowledge of a business's allegedly discriminatory practices." *Id.* at 1027. The California Supreme Court concluded that "an individual bringing an Unruh Civil Rights Act claim against an online business must allege, for purposes of standing, that he or she visited the business's website, encountered discriminatory terms, and intended to make use of the business's services." *Id.* at 1032 (noting also that "[t]hese requirements are sufficient to limit standing under the Unruh Civil Rights Act to persons with a concrete and actual interest that is not merely hypothetical or conjectural"). At first glance, *White* seems to control here, requiring any class member to show that they visited Defendant's website, encountered a discriminatory feature, and intended to make use of its services.

The Ninth Circuit recently considered whether to apply this "bona fide intent" requirement in *Gilbert v. 7-Eleven, Inc.*, 157 F.4th 1057 (9th Cir. 2025). The Ninth Circuit explained that the decision in *White* was "claim specific" and had deliberately been "cabined" to cases where "(1) the defendant was an online business, not a brick-and-mortar store, and (2) the plaintiff did not actually transact with the online business." *Id.* at 1067. It observed that the California Supreme Court "never discussed cases involving derivative ADA claims under § 51(f) or construction-related accessibility claims" and "did not . . . create a 'bona fide intent' standing requirement that applies to all Unruh Act claims." *Id.*

"Because the California Supreme Court [had] not yet addressed whether the standing rule should be extended to other types of Unruh Act claims," the *Gilbert* court had to "predict how the state high court would resolve that question." *Id.* at 1068 (quotation omitted). It declined to extend *White*'s intent requirement to § 51(f) construction-related accessibility claims, such as the claim before it, because the California Supreme Court had "ma[de] clear that it would not require a plaintiff to show they had a bona fide intent to use the defendant's services where . . . the plaintiff actually transacted with the defendant's business." *Id.* The Ninth Circuit explained: "By requiring a plaintiff who personally encountered a construction-related accessibility violation to show they experienced some difficulty, discomfort, or embarrassment as a result, § 55.56(c)

34

adequately ensures the plaintiff was personally injured by the violation and thus has a concrete interest in pursuing their claim.  In such cases, the Court does not need to impose an intent requirement to ensure the plaintiff's interest in remedying the construction-related accessibility violation is 'not merely hypothetical or conjectural.'"  *Id.* at 1070; *see also id.* at 1068 (noting that "the intent element is a *substitute* for either completing a transaction or presenting oneself for services at a brick-and-mortar store—not an *additional* requirement" (emphasis in original)).

This case is not like *Gilbert*.  Plaintiff is not asserting a construction-related claim, and Plaintiff did not complete a transaction or present himself for services at a brick-and-mortar store.  Instead, like in *White*, Plaintiff brings claims against an online business that he did not actually transact with.  However, *White* "never discussed cases involving derivative ADA claims under § 51(f)," so the Court must "predict how the state high court would resolve" the question of whether non-construction-related § 51(f) claims involving a user who visits a website but does not actually transact with it encompass a bona fide intent requirement.  *See id.* at 1067–68 (quotation omitted); *see also Arroyo v. Golbahar*, No. 22-55182, 2023 WL 2064588, at *5 (9th Cir. Feb. 17, 2023) (Thomas, J., concurring in part) (unpublished and non-binding concurrence noting that the "plaintiff in *White* did not attempt to rely on an ADA violation to support his claim").

The Court concludes that the bona fide intent requirement of *White* should apply here.  The factual circumstances of *White* closely match the facts here, and nothing in that opinion suggests that a § 51(f) claim should be treated any differently in nearly-identical factual circumstances.  In addition, the Ninth Circuit in *Gilbert* noted that "it is unnecessary to add a bona fide intent requirement . . . to fulfill the purpose of standing" and "ensure that the plaintiff has a concrete and actual interest that is not merely hypothetical or conjectural" because the Unruh Act already requires "a plaintiff who personally encountered a construction-related accessibility violation to show they experienced some difficulty, discomfort, or embarrassment as a result."  *Id.* at 1069–70 (quotation omitted).[19]  In contrast, *White* supports the "need to impose an intent requirement to

---

[19] As discussed, a plaintiff in a construction-related claim can show that "they personally encountered a construction-related violation at a place of public accommodation and experienced difficulty due to that violation," rather than showing bona fide intent.  *Gilbert*, 157 F.4th at 1068. It might be the case that a class member could comparably demonstrate standing under the Unruh

United States District Court
Northern District of California

ensure the plaintiff's interest in remedying the . . . accessibility violation is not merely hypothetical or conjectural" where the alternative requirement discussed in *Gilbert* doesn't apply. *See id.* at 1070; *see also White*, 7 Cal. 5th at 1032 (noting that requirements that an individual "visited the business's website, encountered discriminatory terms, and intended to make use of the business's services . . . are sufficient to limit standing under the Unruh Civil Rights Act to persons with a concrete and actual interest that is not merely hypothetical or conjectural").[20]

With all of this in mind, the Court concludes that Plaintiff has not adequately demonstrated that common questions will predominate over individual questions. "When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean*, 31 F.4th at 668 & n.12 (noting also that Rule 23 "requires a district court to determine whether individualized inquiries into [a] standing issue would predominate over common questions"). But to establish injury under the Unruh Act, every class member will at minimum need to put forth individualized evidence that (1) they are visually impaired; (2) they used the website during the class period; (3) they encountered an inaccessible store-linked feature; and (4) they intended to make use of Defendant's services. *See Gilbert*, 157 F.4th at 1064 n.4 (explaining that statutory standing under the Unruh Act relates to "whether the plaintiff has adequately alleged injury").

Plaintiff argues that "[e]ven if [he] is required to prove intent," he can do so because "[t]he proposed California subclass definition only includes those who interacted with store-related

Act if they encountered a store-linked component that was inaccessible and experienced difficulty due to that violation, but it's unclear if this would be any different than showing that they encountered a discriminatory component and intended to use Defendant's services. And, in either case, this would implicate individualized inquiries.

[20] This conclusion is consistent with *Thurston v. Omni Hotels Management Corp.*, 69 Cal. App. 5th 299 (2021), which imposed a bona fide intent requirement for a website accessibility claim brought pursuant to § 51(f). *Id.* at 308. However, as the Ninth Circuit has noted, *Thurston* concluded that intent was relevant "to a determination of the merits" of the plaintiff's claims, not her standing. 69 Cal. App. 5th at 309; *see Gilbert*, 157 F.4th at 1067 n.6. It is not entirely clear how to harmonize this conclusion with *White*'s standing-based reasoning. Still, the Court notes *Thurston* because it is the only appellate state court authority on point on the issue, and it suggests that *White*'s intent requirement in website accessibility cases like this one does not hinge on whether a claim is brought under § 51(b) or § 51(f).

36

service barrier functions, such as pick up in store and book an appointment." Reply at 11. In Plaintiff's view, anyone who interacted with a store-linked feature "would only select an item to pick up in store if they intended to do business with a Ralph Lauren brick and mortar location." *Id.* The Court disagrees that everyone who "interacted with store-linked website functionality that provides store-specific information or initiates, modifies, or completes in-person transactions or services at Ralph Lauren store" necessarily intended to do business with Defendant. For example, someone may interact with a store locator because they are preliminarily interested in seeing if there is a store nearby to make a purchase, without yet having formed any intent to visit that store or purchase goods or services from Defendant.

Plaintiff Merrell presents a good example of the types of individualized inquiries that will be necessary to establish intent and statutory standing. In his deposition, Plaintiff stated that he visited Defendant's website because he was "maybe look[ing] at getting a gift for [his] significant other." Merrell Dep. at 32:4–10. He had not previously purchased anything from Defendant's stores or website. *Id.* at 32:11–18. Plaintiff stated he "had problems navigating the products page, the book-an-appointment page, the main landing page, and the find a store locator page." *Id.* at 35:16–21. He "was unable to . . . make enough of a discernment of the page to be able to make an appropriate purchasing decisions," as the links and buttons "weren't very clear" and didn't provide "a prompt with more information or the ability to add to cart or purchase." *Id.* at 36:1–24. At that point he "simply [left] the website." *Id.* at 37:10–19. Plaintiff stated that "[he] didn't know really that there was any kind of in-store pickup or a . . . book an appointment [feature]." *Id.* at 38:9–19. He "didn't try to schedule an in-store pickup," "did not look up directions," and "did not try to book an appointment." *Id.* at 39:3–40:9.

The Court need not decide here whether Plaintiff had the necessary intent for his claim, nor does it mean to suggest that this is the only evidence in the record that is relevant to his intent. But this is the type of evidence that a reasonable jury could credit suggesting that Plaintiff Merrell "interacted with store-linked website functionality"—he was on the book-an-appointment page— but had not formed the necessary intent to use Defendant's in-person services (or to use Defendant's services at all). *Cf. Thurston*, 69 Cal. App. 5th at 302–03 (affirming jury verdict

finding lack of intent where plaintiff introduced evidence that she had encountered issues with reservation function, but defendant introduced evidence that she never tried to book a reservation using a third party website or by calling the hotel directly and never looked at other hotel websites or made any hotel reservation).  This kind of inquiry into intent is highly individualized, and Plaintiff has not demonstrated that common issues will predominate.[21]

More broadly, punting the individualized inquiries regarding class members' use of a store-linked feature into a revised class definition does not avoid predominance problems.  To be sure, "the problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."  *Olean*, 31 F.4th at 669 n.14.  However, revising the class definition here only helps to ensure that the class does not contain as many members without standing.  It does not change the kinds of individualized inquiries that will need to be conducted to determine whether each class member has statutory standing to recover Unruh Act damages.  Plaintiff seems to envision using the revised class definition and proposed claims process "as a vehicle for establishing [statutory] standing, which is highly individualized in this case," *see Stiner II*, 2024 WL 3498492, at *12, and the Court remains unpersuaded by this approach.

These issues on their own would defeat predominance, but the Court also concludes that there will be significant individualized inquiries to determine whether class members encountered an inaccessible store-linked website function and accordingly have statutory standing (or Article III standing).  Defendant argues that its website "consists of over 16,000 . . . pages that are continually changing."  Opp. at 21 (citing Dkt. No. 141-9 ¶ 7).  Plaintiff initially asserts that Defendant's argument about there being 16,000 distinct pages "goes to manageability, not predominance," Reply at 8 n.5, but this is a concern about individualized showings of injury and standing that plainly goes to predominance.  *See Olean*, 31 F.4th at 668 & n.12.

---

[21] Plaintiff again suggests that Dr. Krosnick's survey "captures intent to do business."  Reply at 12.  Plaintiff does not explain how an extrapolated estimate of the number of class members could be used by any individual class member to demonstrate their personal intent.  *Contrast Tyson Foods*, 577 U.S. at 455 (permitting representative evidence where "each class member could have relied on that [evidence] to establish liability if he or she had brough an individual action").

38

Plaintiff then emphasizes that common evidence about Defendant's "centralized website coding[] will show that all store-related service pages were inaccessible during the California subclass period." Reply at 9. The Court credits Plaintiff's evidence that shows that core components of any given store-linked feature were often reused across pages, *see* Dkt. No. 136-4 at 36:1–38:17, meaning that evidence of inaccessibility for one page or component will be the same as evidence for some others. The Court also credits Plaintiff's evidence that "the same families of violations" existed across the website over time, including when using different browsers and tools. *See* Mot. at 11; Easttom Rpt., ¶¶ 48, 51, 60, 78, 96, 106–14, Exs. B–L; Dkt. No. 136-13 at 62:16–63:1, 71:11–25, 73:6–19. As a result, the number of unique pages and features at issue is likely smaller than 16,000, and the analysis for some of these accessibility issues may be the same. In addition, Defendant does not suggest that all 16,000 pages include a store-linked feature, and pages without such a feature will not be relevant to the class members at issue here.[22]

But Plaintiff also does not attempt to explain how much smaller the universe of shared components and pages is than the 16,000 number that Defendant cites. And determining which store-linked feature a class member encountered and whether that feature was inaccessible will be an individualized inquiry. For example, while WCAG may be "informative" for determining whether a shared component is or is not accessible, it is "not dispositive." *Alcazar v. Bubba Gump Shrimp Co. Restaurants*, No. 20-CV-02771-DMR, 2020 WL 4601364, at *4 (N.D. Cal. Aug. 11, 2020). While predominance does not require that there be no individualized inquiries, the centrality of these individualized issues supports a lack of predominance.

---

[22] Plaintiff also introduces evidence that Defendant hired third-party vendor UsableNet to assist with website accessibility, but UsableNet "did not cover whole categories of content and functionality that matter most for the store nexus." Mot. at 9; *see also* Dkt. Nos. 136-5, 136-9 (statements of work with UsableNet); Dkt. No. 136-6 (discussing fact that some responsibilities were outside UsableNet's scope). This evidence is less persuasive and does not change the result. It slightly supports Plaintiff's theory that Defendant's store-linked features were treated uniformly, but the fact that an accessibility vendor did not service these components does not mean that the components were in fact inaccessible. Plaintiff introduces evidence suggesting that the specific "Book an Appointment" flow was inaccessible, *see* Dkt. No. 136-11, but this does not address the Court's concern that individualized evidence would need to be presented for other such store-linked flows.

The Court's decision here is in line with its previous conclusions about predominance in cases involving the Unruh Act. For example, in *Stiner I*, the Court found a lack of predominance where "each class member still must show how" the defendant's policy of forcing scooter or wheelchair users to transfer to a manual wheelchair or passenger seat in order to ride defendant's shuttle "in some way interfered with their full and equal enjoyment of [its] transportation services." *Id.* at 1198. But the defendant argued that this policy wasn't always enforced in practice. *Id.* at 1197. The Court noted that "even if [defendant's policy] is found to violate the ADA on its face, the Court does not see how a power wheelchair user who, for example, was nevertheless always allowed to sit on their scooter while boarding vehicles and during transit could, without more, have Article III standing to recover under the Unruh Act." *Id.* at 1198. A comparable problem is present here for determining statutory standing under the Unruh Act: even if Defendant's store-linked features are all inaccessible in a way that violates the ADA, class members will need to show that they actually interacted with these store-linked services and that they intended to use Defendant's goods or services. Thus, "whether and to what extent the members of the proposed class were concretely injured," at least as a matter of statutory standing under the Unruh Act, "raises evidentiary questions that likely will vary by class member." *Id.* at 1198.

Other cases have applied similar reasoning, even if they were considering individualized inquiries into "difficulty, discomfort, or embarrassment." *See, e.g.*, *Vondersaar v. Starbucks Corp.*, 719 F. App'x 657, 659 (9th Cir. 2018) (noting that "class-wide issues do not predominate over the numerous individual questions posed by plaintiffs' Unruh Act claims, including whether a class member is disabled, which Starbucks store or stores he visited, how many visits he made, how high the handoff counter was at the time he visited, whether he presented himself with the intent of purchasing a product, what that product was and whether it would normally have been served via the handoff counter, and whether the class member was actually denied full and equal access");[23] *Stiner II*, 2024 WL 3498492, at *11 (finding lack of predominance "when the real

[23] This is an unpublished memorandum disposition that the Court considers for its persuasive value.

United States District Court
Northern District of California

question seems to be whether standing can be established by a claims process in an Unruh Act access barrier case where class members' interaction with the barriers is variable"); *Vargas v. Quest Diagnostics Clinical Labs.*, No. CV 19-8108-DMG (MRWX), 2021 WL 5989958, at *9 (C.D. Cal. Dec. 2, 2021) (finding lack of predominance where each class member would need to show "(1) that he or she is legally blind and (2) that he or she visited a patient service center *with* a[n inaccessible] kiosk and *without* a staffed desk (3) during the class period," even where the "record here is uncontroverted that [the] kiosks were identical" (emphasis in original)).

The Court recognizes that some courts have come to a different conclusion. For example, in *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562 (N.D. Cal. 2018), the court certified a 23(b)(3) class alleging a construction-related Unruh Act violation despite the additional fact that "each class member will have to prove that they personally encountered an Unruh Act violation that caused difficulty, discomfort, or embarrassment." *Id.* at 585 (quotation omitted). The plaintiff alleged that there were access barriers in a football stadium, such as inaccessible seating, and the defendant argued that class members' experiences would vary widely across such a large stadium. *See id.* at 569–70, 585. The court was persuaded that "the Stadium is still *one* building and . . . embodies common architecture, plans, remodels, policies [and] barriers to access." *Id.* at 586 (quotation omitted) (emphasis in original). The class there was similarly sized to the class here, *see id.* at 586, and the court's holding is analogous to Plaintiff's arguments about the common architecture of Defendant's website. Nevertheless, as in *Stiner II*, the Court continues to believe that the exact amount of variation across the relevant website or place of public accommodation is not necessarily the dispositive question for predominance (though, as discussed above, it has some relevance). Rather, the key question remains whether standing and injury can be established with common class-wide evidence. Here, the Court concludes that the answer to that question is no. Accordingly, the Court concludes that individualized inquiries will

41

predominate, and the Court **DENIES** the motion as to Plaintiff's 23(b)(3) class.[24][25]

### IV.    CONCLUSION

The Court **DENIES** Defendant's motion to exclude, Dkt. No. 82.  The Court **GRANTS IN PART** and **DENIES IN PART** the remaining motions to exclude, Dkt. Nos. 84, 109.  The Court **GRANTS IN PART** Plaintiff's motion for class certification, Dkt. No. 77, and certifies a nationwide 23(b)(2) class defined as:

> All legally blind individuals who have attempted to access Defendant's website using screen-reading software from January 2022 up to and including final judgment in this action.

Mot. at 7; FAC ¶ 48.  The Court **DENIES IN PART** Plaintiff's motion for class certification, Dkt. No. 77, as to the 23(b)(3) California subclass.  The Court **TERMINATES** Dkt. Nos. 136, 142, and 146, which are unredacted versions of the original motions.

The Court **ORDERS** that Lead Plaintiff Richard Paul Merrell is appointed as Class Representative and **ORDERS** that Lead Counsel Wilshire Law Firm, PLC shall serve as Class Counsel.

The Court further **SETS** a case management conference in this case on August 4, 2026, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at

---

[24] Other cases finding predominance are distinguishable.  In *Fashion Nova*, for example, the defendant advanced considerably weaker arguments about individualized issues, and the court did not consider whether there was a bona fide intent requirement.  *See* 2022 WL 19975445, at *3. And in *Davis*, the defendant did not raise the issue, but the court briefly concluded that any intent requirement "would not defeat predominance" because the class members could use LabCorp's records to identify class members who had actually used their services.  2022 WL 22855520, at *1, *10 n.12.  Even if the *Davis* court was correct, Plaintiff has not demonstrated that such records exist for all or any store-linked features, or that "interacting" with something like a store locator manifests intent in the same way that visiting a physical LabCorp patient service center might. *Davis* was also distinct because the allegedly-inaccessible kiosks were identical, and LabCorp "was aware of which [locations] in California have kiosks, when they were installed and made operational, and how each [location] is staffed," which meant any variations between class members were "not as significant" as LabCorp made them out to be.  *Id.* at *10.

[25] Because the Court finds a lack of predominance, it does not reach Plaintiff's arguments about superiority.

United States District Court
Northern District of California

least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.  The Court **DIRECTS** the parties to meet and confer and file a joint case management statement by July 28, 2026.

      **IT IS SO ORDERED.**

Dated:   7/9/2026

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

43